FILED IN CHAMBERS
U.S.D.C. Atlanta

JAN 3 0 2006

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ELI JACKSON et al.,

Plaintiffs,

v.

WAFFLE HOUSE, INC.,

Defendant.

CIVIL ACTION

NO. 1:04-CV-0758-RLV

O R D E R

The plaintiffs filed the instant action alleging that Waffle House Inc., discriminated against them on the basis of their race in violation of 42 U.S.C. § 1981 and Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq. This matter is currently before the court on Waffle House's motions for summary judgment with regard to the claims of Eli Jackson [Doc. No. 136], Terrance Taylor [Doc. No. 138], Brenda French [Doc. No. 139], and Hakieem Mack [Doc. No. 205]. Also pending is the plaintiffs' motion for leave to file certain documents under seal [Doc. No. 219].[1]

---

[1] In the plaintiffs' motion for leave to file certain documents under seal, plaintiffs Jackson, Mack, Brenda French, and Taylor argue that certain documents must be filed under seal because the documents either reflect or refer to material designated as confidential under the Consent Protective Order. Moreover, the plaintiffs argue that the Consent Protective Order requires materials so designated to be filed under seal. The court GRANTS plaintiffs' motion for leave to file the documents referred to in said motion [Doc. No. 219].

## I. The Admissibility of Pattern and Practice Evidence

As a preliminary matter, the court must address the admissibility of certain evidence submitted by the plaintiffs to prove pattern and practice. Waffle House filed a notice styled "Defendant's Notice of Objection to Admissibility of Declarations, Testimony, and Memoranda Submitted By Plaintiffs in Opposition to its Motions for Summary Judgment on the Claims of Plaintiffs Eli Jackson, Terrance Taylor, and Brenda French" [Doc. No. 170]. The plaintiffs subsequently filed a response [Doc. No. 186]. The court views Waffle House's notice as a motion to strike said evidence.

In their Amended Complaint, the plaintiffs allege, "The conduct alleged herein occurred pursuant to a pattern and practice on Waffle House's part of discriminating against African-Americans in the provision of food and services." To establish a "pattern and practice" of race discrimination, the plaintiffs must show that race discrimination is Waffle House's standard operating procedure and prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. The evidence submitted must establish by a preponderance of the evidence that discrimination is the company's standard operating procedure--the regular rather than the unusual practice. See E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1287-88 (11th Cir. 2000).

In this court's previous order dated August 12, 2005, the court considered and rejected the plaintiffs' argument that certain

newly discovered evidence entitled them to Waffle House's log of complaints on a nationwide, rather than store-specific, basis [Doc. No. 169].   In that order, this court stated:

> After carefully considering the plaintiffs' motion, the defendant's response, and the plaintiffs' reply, along with all exhibits, this court adheres to its November 8, 2005, order and will reconsider the order only insomuch as it ruled that the defendant must produce "formal written complaints of racial discrimination at Waffle House Units 625, 1058, 32, and 722 for three years immediately preceding the filing of the original complaint." Order, p. 23.   Since plaintiffs Mack and Taylor have changed the date of their alleged discrimination, this court orders the defendant to produce formal written complaints of racial discrimination at Waffle House Units 1058 and 722 for five years immediately preceding the filing of the original complaint and its non-privileged documents relating to its investigation of these complaints.   The defendant is ordered to produce these additional documents within 20 days from the date this order is docketed.

To prove pattern and practice with regard to the claims of the plaintiff, the plaintiffs submitted the previous deposition testimony and declarations of Jesse Gantt[2] and a report produced by a business expert, D. Jan Duffy, regarding Waffle House's business practices and the lack of mechanisms to prevent racial discrimination.   Additionally, the plaintiffs have submitted the

---

[2] Gantt was a manager of a Waffle House unit in a Beaufort, South Carolina, who ended his employment with Waffle House in 1998. Gantt testified that he was taught to minimize his African-American employee and customer base as much as possible because, among other things, African-American customers tended to order high food cost, low profit menu items like T-bone steaks.   Gantt testified that sometimes Waffle House would pull only a few such items from the freezer on a night shift, so that servers could tell African-Americans they were out.

affidavits and/or declarations of Venessia Marsh Gresham,[3] Danita Kasinger, Barabara Ann Hale,[4] Gantt, Greg Gainey, Helena Bonner, Bianca Taylor, Robert Fox,[5] in an attempt to prove that Waffle House engaged in a pattern and practice of racial discrimination.

With regard to this evidence, the court notes that it has previously ruled that Gresham's statements would not be admissible. With regard to Gantt's deposition and declarations, Waffle House

---

[3] This court has already ruled that the plaintiffs may not rely on testimony from Gresham in this case [Doc. No. 165]. The court ruled that the plaintiffs had failed to timely disclose Gresham as a witness in this lawsuit pursuant to Rule 26(a)(1) and (e) of the Federal Rules of Civil Procedure and Local Rule 26.1. The plaintiffs objected to Waffle House's attempt to depose Gresham by moving to quash the subpoena for her deposition [Doc. No. 161]. Consequently, the court held that since Gresham had not been deposed by Waffle House, the plaintiffs could not utilize her declaration and/or call her as a witness in support of any of their claims.

[4] Kasinger and Hale were employees of a Waffle House in Cartersville, Georgia, who alleged that they were fired after they reported that the cook in that store, Jason Champion, would not serve African-American and Hispanic customers. With regard to the events that transpired at the Cartersville, Georgia location, the court notes that Mack has submitted the deposition of Audrey Tassinari, who was a Waffle House investigator, who came to Carterville, Georgia, to investigate allegations by employees at that Waffle House that there was a white cook who had openly and repeatedly refused to prepare food for African-American and Hispanic customers, telling a black customer on one occasion, "I cook for Caucasians, I don't cook for Niggers." However, the court notes that Tassinari's deposition as well as the affidavits do not refer to practices at the particular locations that are subject to this suit.

[5] Gainey, Bonner, Taylor, and Fox are former Waffle House employees who allege that Waffle House engaged in hiring practices that discriminated against African-Americans.

4

argues that his deposition and declarations should be stricken from the record because they are not probative or relevant to the plaintiffs' claims because Gantt ended his employment with Waffle House in 1998 and worked in South Carolina [Doc. No. 170]. Furthermore, Waffle House argues that Gantt's testimony is devoid of a single allegation of customer race discrimination at the units in question in this suit. This court agrees. Therefore, the court concludes that Gantt's testimony and declarations are inadmissible and are stricken because Gantt's testimony and declaration do not demonstrate a pattern and practice of discrimination against customers with regard to the particular Waffle House units in question in this suit.

With regard to the various declarations submitted by the plaintiffs to prove pattern and practice of customer discrimination, Waffle House argues that the declarations of Gantt, Gainey, Bonner, Taylor, and Fox, do not set forth a single allegation of customer discrimination at any specific unit at any specific time. Furthermore, Waffle House argues that the declarations of Hale and Kasinger refer only to alleged misconduct by one employee at a restaurant other than locations in question.

In Waffle House's notice of objection to the admissibility of (1) the affidavits of Gresham, Gainey, Bonner, Taylor, Fox, Kasinger, Hale, and Gantt; (2) the deposition transcript of Gantt; and (3) two memos produced by Gantt, Waffle House argues that (1)

5

the affidavits of Gainey, Bonner, Taylor, Fox, Kasinger, and Hale should be stricken because the plaintiffs failed to timely disclose those witnesses, (2) that these affidavits should be stricken because the "testimony" is neither relevant nor probative to the plaintiffs' claims, and (3) these declarations should be stricken for containing inadmissible hearsay testimony [Doc. No.170]. Furthermore, Waffle House argues that Gantt's deposition and declarations (1) relate solely to events that occurred at a Waffle House in Beaufort, South Carolina, (2) are devoid of a single allegation of customer race discrimination at any Waffle House that is subject to this suit, and (3) recall events that occurred no later than 1998.  Consequently, Waffle House argues that Gantt's deposition testimony, declarations, and the memoranda produced by Gantt should be stricken.

In its prior order dated August 12, 2005, this court stated, "Unless it is clear that nationwide practices are relevant, discovery should be confined to the local units of a corporation" citing Brown v. Am. Honda Motor Co. Inc., 939 F.2d 946, 954 (11th Cir. 1991).  In Brown, the Eleventh Circuit held that  anecdotal evidence of unrelated, sporadic incidents claimed by others to have occurred at different locations is not probative of a pattern or practice of discrimination.  This court is bound by the Eleventh Circuit's interpretation of pattern and practice evidence.

Having examined the affidavits of Kasinger, Dale, Gainey, Bonner, Taylor, and Fox, the court concludes that these affidavits do not allege any wrongdoing against any customer at any of the four Waffle House units at issue in this lawsuit.   In fact, the affidavits of Gainey, Bonner, Taylor, and Fox, merely allege discriminatory hiring practices at different locations unrelated to the current suit.   Waffle House's hiring practices are not the issue of this case.   In fact, most of the declarations submitted by the plaintiffs refer only to alleged discriminatory <u>hiring</u> practices at different units, and only two of the declarations, i.e., the affidavits of Kasinger and Hale, allege mistreatment of a customer.   The affidavits of Kasinger and Hale center around allegations of racial discrimination that occurred at a Cartersville, Georgia, Waffle House which are unrelated to this suit.   In fact, the allegations of Kasinger and Hale concern only one employee who did not work at any of the units at issue in this suit.   In its prior order, the court directed the plaintiffs to narrow their pattern and practice discovery to prior incidents of racial discrimination of customers at the units in question.   Thus, only the units that the plaintiffs visited are relevant to this

suit.[6]   Therefore, the court strikes the affidavits of Kasinger, Dale, Gainey, Bonner, Taylor, and Fox.[7]

With regard to Duffy's report, Waffle House argues that the report relies upon the declarations and affidavits of individuals who have not been deposed by the Waffle House.  The court concludes that the expert report of Duffy, while admissible, is only minimally relevant to the plaintiffs' claims and, therefore, is insufficient to prove pattern and practice of customer discrimination by Waffle House.

Having found that the evidence submitted by the plaintiffs was either inadmissable and/or insufficient to prove pattern and practice of racial discrimination and with no direct evidence of racial discrimination, the court limits its inquiry into whether the plaintiffs presented sufficient circumstantial evidence of racial discrimination.

---

[6] With regard to other instances of discrimination that occurred at the Piedmont Road Waffle House, Mack has submitted a copy of a customer complaint filed by a Hispanic customer.  In the case summary of that complaint, a customer alleged that a waitress told him that "she wasn't serving no Mexicans."  The court finds that this evidence, while admissible, does not prove that the Piedmont Waffle House had a pattern and practice of discriminating against African-Americans, which is what Mack alleges.

[7] Even if this court had allowed the affidavit testimony of Kasinger, Dale, Gainey, Bonner, Taylor, and Fox, the court would still have determined that this affidavit evidence was insufficient to demonstrate pattern and practice of discriminating against African-Americans customers because the affidavits refer to events that occurred in different years, at the hands of different employees, under different circumstances, and at different locations than those alleged by the plaintiffs in this case.

## II. Factual Background

The following facts are gleaned from the court's review of the record and the parties' submissions. The relevant procedural history of this case is set forth in this court's previous orders.

### A. Brenda French

Just after midnight on July 8, 2001, Brenda French, an African-American woman, along with her daughter, Nicole French, and her three young grandchildren stopped at a Waffle House in Conyers, Georgia, on their way back from a family birthday party. Brenda French and one of her grandchildren entered the Conyers Waffle House and Brenda French placed a to-go order consisting of "scrambled eggs, a waffle, hash browns, and a medium T-bone steak." Her daughter, Nicole, seated in her parked minivan had a view into the restaurant. Brenda French testified that when they entered the restaurant, "one, two--maybe four" tables were occupied and there were no customers standing near the counter. In contrast, Nicole French, who watched her mother through her rear van window, recalled that there were two or three customers sitting at the counter and that all but a couple of booths were occupied.

When Brenda French entered the restaurant, a white waitress was standing near the counter. Brenda French testified: "[T]he waitress came up and said, 'Can I help you [?],' and I placed my order for T-bone steak, hash browns, scrambled eggs, and a waffle"

9

to-go.[8]  Approximately fifteen minutes later, "[o]ne other white man came in, sat on the bar, [and] placed his order" which was taken by a different waitress.  A factual dispute in the record exists as to whether this order was a to-go order or whether the white customer dined in.  After that customer received a hamburger, Brenda French asked how long it would take for her to get her food.  The cook replied that "he was busy [and h]e'd get to it when he could."  A few minutes after the first white customer entered the restaurant, a white couple placed a to-go order.  Brenda French does not know what the couple ordered precisely, but she saw the waitress hand them three to-go containers.  Thereafter, Brenda French testified, "And then another white man came in, [and] placed his order to go."  "He sat at a booth too. . ."  However, Brenda French does not know what food or drink he ordered.  Brenda French alleges that all three orders were placed and completed while she waited for her to-go order to be prepared.

Nicole French, who had been waiting in her car, came in and asked her mother what was taking so long.  The cook, who apparently overheard the women's discussion, said, "I'm doing the best I can."  Nicole French responded, "That can't possibly be true, because my

---

[8] French testified that no one else in her party ordered anything, as she planned to share her food with her grandchildren.  Her granddaughter testified that French also ordered an additional meal consisting of a waffle, ham, and cheese and eggs for her.  Brenda French's granddaughter testified that she did not recall Brenda French asking about the order prior to the time when Nicole French entered the restaurant.

mom has been sitting here for at least 30 to 35 minutes.  And I
hope it's not because she's the only black in here."  The cook
responded: "I don't have to serve you.  And you all can get out."
Nicole French and the cook "just exchanged words from that point
on," during which Nicole said to the cook, "I would come across the
counter and grab you.  You don't know me very well."  The cook
responded, "You all just need to get out"; "I don't have to serve
her"; and "I'm going to call the police."  After the verbal
confrontation with the cook, Nicole French then left the Waffle
House to wait outside in the parking lot.  The Frenches admit that
the cook did not make any racial remarks, jokes, or slurs directed
toward either Brenda French or Nicole French.  However, the
Frenches did not receive the to-go order that had been placed.

     After Nicole French walked out of the restaurant, the cook
then called the police at 12:42 a.m. and reported "unruly
customers."[9]  The police arrived in "roughly two minutes."[10]  After

_____

     [9] Both Brenda French and Nicole French allege that the cook
told the police that "two niggers [are] up here trying to start a
fight."  With regard to the cook's statements to the police, Brenda
French testified:

     Q: Did anyone tell you that Mr. Minton made a racial
     remark?
     A: Yes, I talked to a policeman, and he said they had got
     a call - -the police had got a call, that niggers were up
     there trying to fight.   And that was one of the
     policemens that I talked to.
     Q: One of the police officers who came to the Waffle
     House--
     A: Uh-huh.
     Q: --that night-

11

talking to the Frenches and the cook, one of the police officers found that there were no grounds to write a criminal citation.  The officer further concluded that the cook and Waffle House had not done anything to Brenda French or her family based on their race. While Nicole French and the cook were arguing, another African-American entered the restaurant and placed a to-go order with the cook.  Brenda French alleges that while they were in the parking lot talking to police officers this African-American male received his food and left the restaurant.  Brenda French believed that the

---

A: Uh-huh.
Q: Yes?
A: Yes. I'm sorry.
Q: Told you that the cook had made a racial remark.
A: Yes.
Q: Did he say the cook made the racial remark on the telephone?
A: He said, "We got a call that two niggers were up here trying to fight."
Q: He said that to you.
A: Yes.  I was talking, because I asked him why was it so many police called out on that particular call.
Q: Do you know if he was even referring to someone at Waffle House as having used that racial name?
A: No. That's just all he said—

The record reflects that neither Nicole nor Brenda French heard the cook's alleged statement to the police; therefore, the cook's alleged statement to the police officer is inadmissable hearsay.

[10] One of the police officers who reported to the scene, Officer Dillard, told the Frenches that the cook had told him that he was trying to serve the dine-in customers before to-go orders. Also, the officer stated that the cook was "not making a decision based on race, color, religion, sex and all that good stuff because there were people of all origin in there."  The court finds that the police officer's statements regarding what the cook said to him are inadmissable.

African-American customer "got his food, and I was here before he was."

Brenda French testified that having not received their food her party then stopped at the Waffle House restaurant on Sigman Road in Conyers, Georgia, on the way home to place an order for the same food that she previously had not received.  According to Brenda French, she received her food at the Sigman Road Waffle House in seven or eight minutes, and she found both the food and the service satisfactory.  At the Sigman Road Waffle House, Brenda French told a waitress about the incident that had occurred earlier in the night.  The waitress summoned the Sigman Road Waffle House manager, who gave Brenda French the toll-free number she could call to lodge a complaint, and apologized to her.

Brenda French alleges that she called Waffle House's toll-free number from her work phone to lodge a complaint, and that "they apologized."  Then, Brenda French alleges that a couple of weeks later, Waffle House mailed her a letter of apology.  In contrast, Waffle House disputes that Brenda French ever reported the incident on the toll-free number.  During discovery, Brenda French did not produce records of the call or the letter she allegedly received from Waffle House.

### B. Eli Jackson

Eli Jackson, who is an African-American male, arrived at the Covington Waffle House at approximately 11:00 a.m. on January 4,

2003.   Jackson was wearing dark sunglasses, a green pull-over
sweatshirt, short jeans, Timberland boots and a black "du-rag,"
which he described as "just, as they say in the street, the
gangster rap attire, all baggy and everything."[11]  When he arrived,
he walked up to the counter, where he waited behind a customer who
was paying a Waffle House employee for food.  The server behind the
counter was a white female, Deborah Day.  When the female customer
who was in front of Jackson completed her transaction, Jackson
stepped up to the counter and placed a to-go order for two 14-ounce
T-bone steak breakfasts.  Day asked Jackson to prepay for his food
before it would be prepared.  At the time of the incident, Waffle
House had a written policy that customers were not to be asked to
prepay for their food.  After placing his order, Jackson stepped

---

[11] With regard to whether he felt his attire was related to his
race, Jackson testified:

Q: What about your attire?
A: Like I told you, I had on a green sweatshirt pullover
with a hood, a du-rag, dark glasses, short pants.
The-- I mean, just everything--the attire was just, as
they say in the street, the gangster rap attire, all
baggy and everything.
Q: That could be totally unrelated to your race; right?
A: The what now?
Q: The attire.
A: Could be what?
Q: It could be totally unrelated to your race?
A: Correct.  It could be.
Q: It could have been Ms. Day just saw you in the way you
were dressed and decided to make you pay, and it was not
something that was related to your race; correct?
A: I mean, I don't know what her intentions was.  It
could be. I don't know.

back to allow the customer behind him to step forward and place an order.[12]

Jackson testified that three white customers ordered to-go orders, while he was waiting for his order.  Jackson testified that he saw two of those three white customers receive their food and then pay.  While Jackson waited, he noticed a poster on the wall stating it was against Waffle House policy for its employees to ask customers to prepay for food.  When Jackson turned away from the poster, he observed his server tap another female Waffle House employee on the shoulder, point to him and said something which Jackson could not hear.  After reading the poster, Jackson concluded that his female white server had mistreated him and he testified that he became "pissed off," "angry," and embarrassed. Day brought Jackson his to-go order when it was ready, and Jackson did not approach Day to ask her why she asked him to prepay for his food in violation of Waffle House's stated policy.  Jackson testified that he believed that it took a reasonable time for his to-go order to be prepared.

After receiving his order from Day, Jackson left the restaurant without incident.  As he exited the restaurant, Jackson obtained the telephone number for Waffle House's toll-free customer

_____

[12] Jackson testified that at the time of the incident he had observed at least one other African-American customer dining in the restaurant.  However, Jackson did not know what level of service the African-American customer received, if he had been required to prepay for his food.

service hotline, which was posted on a window near the front door to the restaurant.  Thereafter, Jackson returned to his daughter's house where he told his girlfriend and his daughter about his experience.  He told them that he believed he had been asked to prepay because of his race or his attire.  He told his daughter, "I don't know if she--if it was because she didn't like blacks or if it was the way I was dressed."

On January 6, 2003, Jackson called Waffle House's corporate headquarters and spoke to a customer service representative.  In Jackson's customer complaint, Jackson stated that he felt "he was being discriminated against because of his race and his attire." On the same day, Waffle House sent Jackson a letter stating that it took his allegations "very seriously" and would begin an investigation into the matter.[13]  The Waffle House investigator interviewed some of the employees on duty during Jackson's visit. Based on an investigation, Waffle House concluded that Jackson had not been discriminated against on the basis of race.

---

[13] During the course of the investigation, Jackson's server Day could not recall the incident and made the following statement:

> We talked about to goorders [sic], that a customer claimed I made him pay before I would call the order to the grill op.  I would never do something like that.  I was asked about taking money before food is ready?  Only if the customer offers or wants to go ahead [and] pay.

## C. Terrance Taylor

Terrance Taylor, an African-American male, arrived at the Stockbridge, Georgia, Waffle House on a Saturday morning to place a to-go order for breakfast on July 8 or 15, 2000.[14] Upon entering the restaurant, Taylor was greeted by a Waffle House employee and asked if he was "going to dine in or take out." Taylor replied that he was going to place a to-go order and walked over to the register where a female Waffle House employee was standing. Taylor observed that out of the nine booths "[a]bout six tables were occupied." Taylor testified that he saw three Waffle House employees, consisting of two female servers and one grill cook. Taylor placed his to-go order for "cheese egg, grits and wheat toast" with the female server who was standing at the cash register. The female server told him the price of his order. The female server then asked him, "Did [he] want some coffee?" Taylor testified that he did not have any problem with the service he received while placing his to-go order. Taylor prepaid the female server for his food,

---

[14] Taylor alleged in the Amended Complaint that he had visited the Stockbridge Waffle House in the summer of 2002. After the court ordered him to provide a more specific date and time of his alleged incident, Taylor advised Waffle House that this alleged visit occurred during a Saturday in July 2002. Taylor testified to that effect at his deposition in January 2005. However on February 17, 2005, Taylor's counsel notified Waffle House that Taylor was changing the year of his alleged visit to 2001. On March 4, 2005, Taylor executed a declaration again changing the date of his alleged incident to July 8 or July 15, 2000. Taylor's counsel did not provide that declaration to Waffle House until March 14, 2005, six days after discovery ended.

and he walked over to an empty bar stool at the counter to wait for his order.

Thereafter, a white couple, which had what Taylor described as a New York accent, entered the restaurant and sat relatively close to him. At that time, Taylor testified that he had been seated for approximately 12-13 minutes. However, Taylor stated that he did not know if other customers entered the Waffle House after the white couple. Furthermore, Taylor testified that he did not recall the white couple placing their order. Nor does Taylor recall which of the two servers took their order. Taylor testified that shortly after the white couple placed their order they received their food and began eating their food at the counter. However, Taylor was unable to recall what the white couple was eating. Taylor testified that the white woman stated, "Wow, how did we get our food before you, you've been sitting here way longer than us." Moreover, Taylor recalled the white man stating, "Yeah, you have been sitting here for a while." Taylor motioned to the female server and the grill cook and stated loudly, "Yo, how did they get their food before me? I have been here way longer than them."

Taylor testified that the cook "didn't make any attempt at all to get [his] food, to check to see what [his] order was, to see if it was being ready, or nothing. [The cook] just turned around, gave [him] like a nasty look and continued cooking, as if [he] wasn't even there." Taylor noticed a tray of food to the right of the

18

grill that he believed was his that was sitting next to the grill unserved for 10 minutes.  Taylor stated loudly to the cook, "Yo, my food is right there."  According to Taylor's testimony, the grill cook did not respond to Taylor and continued cooking.  Taylor testified that he did not know if any other customers placed to-go orders while he was waiting for his food.

Taylor recalls that the grill cook handed the boxed order to the female server "eight minutes" after he noticed his food sitting on the counter for ten minutes and complained to the grill cook for a second time.  Taylor then walked to the cash register where the female server handed him his order.  Taylor did not complain to anyone about his service despite being dissatisfied.  While Taylor's to-go order contained all of the food he ordered and paid for, Taylor testified that his food was too cold to eat and had to be discarded.

It is undisputed that Taylor did not report this incident to Waffle House's customer complaint line.  Moreover, Taylor did not take any action with regard to his claim for the remainder of 2000, all of 2001, 2002, and most of 2003.  Sometime in late 2003, Taylor was watching a television news broadcast which included media coverage of several plaintiffs discussing alleged discriminatory service they purportedly had received at Waffle House.  Thereafter, Taylor called the attorney advertised during the television news

19

presentation to discuss the above incident and the potential to bring suit against Waffle House.

### D. Hakieem Mack

In the Amended Complaint, Hakieem Mack, an African-American male, alleges that he and Tashina Green[15] visited the Waffle House restaurant located on Piedmont Road in Atlanta, Georgia, on May 3, 2003, at approximately 8:00 a.m.   According  to  the  Amended Complaint,

> 23. Plaintiffs waited for over an hour at their table without being approached by any member of the wait staff. During that time period, the restaurant at times was busy, but was never filled to capacity.

> 24. Ms.  Green eventually was  able  to  flag  down  a waitress,  a  White  woman  hereinafter  referred  to  as "Waitress 1." Plaintiffs informed Waitress 1 that no one had taken Plaintiff's order in the more than an hour they had been waiting.   Waitress 1 did not apologize to Plaintiffs; nor did she take their order.   Instead, she stated  that  she  would  send  another  waitress  to  take Plaintiffs' order.

> 25. Another 15 minutes passed before a second White waitress, "Waitress 2," approached Plaintiffs Mack and Green and took their order.   Waitress 2 did not apologize to Plaintiffs for their long wait for service, even though by the time Plaintiffs' order was taken, approximately an hour and a half had passed since Plaintiffs seated themselves.

> 26. After finally placing their order, Plaintiffs waited for another 45 minutes to an hour longer, but still received no food.

---

[15] Green originally was a party to this suit; however, Green was subsequently dismissed from this suit for her failure to prosecute her claims.   Green failed to appear for her deposition twice [Doc. No. 169].

Thereafter according to the Amended Complaint, Mack asked the waitresses and the manager what had happened to his order. According to the allegations contained in the Amended Complaint, the manager stated that the restaurant staff thought Mack and Green had placed a to-go order and the order had been sent to another Waffle House location.  According to the Amended Complaint, the manager of the Piedmont Road Waffle House stated that if Mack and Green wanted their food, they would have to go to the other Waffle House location which was located down the road.  Furthermore, the Amended Complaint alleges:

> 31. Plaintiffs understood the manager's statements to mean that they would not be served at the Piedmont Road Waffle House.  They left the restaurant without ever receiving their food.  Plaintiffs did not go to the other Waffle House referenced by the manager because they disbelieved the manager's story.

> 32. During the time Plaintiffs were waiting, Plaintiffs observed several White customers come into the Piedmont Road Waffle House after Plaintiffs had seated themselves, including both "dine-in" and "to-go" customers.  These White customers were able to place their food orders and be served promptly, while Plaintiffs were still waiting. Plaintiffs heard no other customers being informed that they would have to go to a different location if they wanted to be served.

However, the record reflects significant confusion over the date of the alleged incident.  During his deposition taken on January 28, 2005, Mack testified that he visited the Piedmont Road

Waffle House on May 3, 2002.[16]  However, Mack could not explain how he was certain his alleged visit occurred in 2002 as opposed to 2003.  Nor did Mack have any document or witness to prove that he visited the Piedmont Road Waffle House on May 3, 2002.[17]  Moreover, despite claiming that the events occurred on May 3, 2002, Mack does

---

[16] With regard to the date of the incident, Mack testified:

Q: Mr. Mack, when did you first conclude that this visit actually happened a year before what you've told the Federal Court?
A: Say that again.
Q: When did you first conclude that the date that you told the court was wrong?
A: I did not write this.  I -- I know when the date was. And that's not the date.
Q: My question was: When did you first conclude that that date in this document that you sent to the Federal Court is incorrect?
A: I know the date.  I just noticed it on this document just a minute ago.
Q: Just a minute ago.
A: Yes.
Q: As we all sat here?
A: Yes. I noticed it just at that point.
Q: That was the first time that it ever occurred to you that the 3 ought to be a 2; is that what you're telling me?
A: I know the date is--was 2002.  It was the first time I noticed it on this document.

Thereafter, Mack testified:

Q: Is that a conversation you would have on the day of her birthday?
A: Yes.
Q: But not the week before her birthday?
A: It could have been-yeah.  Sure. Definitely could have been the week before.

[17] Green, his companion, having previously been dismissed is unavailable to corroborate Mack's testimony.

not know what day of the week he allegedly visited the Piedmont Road Waffle House. Mack testified that his mother's birthday was also on May 3. Mack testified, "Well, the reason I remember it being so close to my mother's birthday is because Tashina was supposed to--we were talking about what I should do for my mother's birthday." However later in the deposition, Mack testified that he and Green did not even discuss his mother's birthday while they were in the restaurant. Mack also testified that his visit could have occurred months prior to May 3, 2002. By the end of his deposition, Mack testified that his visit may have occurred as early as mid-February 2002 or as late as May 3, 2002. Throughout the deposition, Mack consistently maintained that he was certain that he did not visit the unit after May 3, 2003.[18]  On March 12, 2005, after the discovery period ended, Mack executed a declaration again changing the dates of his alleged visit to the Piedmont Road Waffle House to sometime between April 4 and May 6, 2002.

---

[18] Mack testified that he interacted with two white waitresses during his visit to the Piedmont Road Waffle House.  However, records produced by Waffle House indicate that the only day during the week of May 3, 2002, when two white waitresses simultaneously worked was on May 5, 2002.  When asked how he would respond if Waffle House's records showed that there were not two white waitresses in the restaurant during the entire week of May 3, 2002, Mack said, "I would ask: Were there two white women for the entire month?"  When asked how he would respond if Waffle House's records showed that there were not two white waitresses staffed during the week preceding and the week of May 3, 2002, Mack responded, "I never gave you a specific date."

The court also notes that Mack's deposition reflects significant ambiguity over the composition of the customers and employees at the Waffle House.   In the Amended Complaint, Mack alleged that all of the employees in the Piedmont Road Waffle House during his visit were white.   However contrary to his allegation contained in the Amended Complaint that all of the employees in the Piedmont Road Waffle House were white, Mack testified that there may have been an African-American cook working during his visit, but he was not totally sure of his recollection.

Furthermore, Mack could not recall how many servers were working during his visit.   With regard to the alleged two female servers working at the time, Mack testified that Waitress #1 was shorter and younger than the second waitress.   Concerning Mack's description of Waitress #1, he could not describe her hair color, whether she wore glasses, had any tattoos, or wore any jewelry. With regard to Waitress #2, Mack testified only that she was taller and older than Waitress #1.   However, Mack was unable to give any further description of Waitress #2.   Mack testified that during his alleged incident he spoke to a manager while he was in the restaurant; he described the manager only as being a white male who stood approximately six feet, one inch tall and who was between the ages of 33 to 45.

With regard to the composition of the customers at the time of the incident, the court notes that Mack gave conflicting testimony.

24

At various times during his deposition, Mack testified that all of the customers he saw in the Piedmont Road Waffle House during his visit were white, that he didn't know if he and Green were the only black customers, that the majority of the customers he saw were white, and that most of the customers he saw were white, and that the customers he saw were mainly white.   Furthermore, Mack could not estimate how many customers he saw while he sat in the booth.

With regard to how long he spent at the Waffle House in question, Mack could not provide a concrete answer because he was not wearing a watch.   He estimated that he entered the establishment around 8:00 a.m. and that he left around 10:30 a.m. or 11:30 a.m.  Mack testified that the Waffle House was busy most of the time while he there.

As to the specific allegations contained in the Amended Complaint, Mack testified that neither he nor Green attempted to make contact with any Waffle House employees during the first hour they were in the restaurant because they were engaged in a conversation.   After about one hour, Mack stopped Waitress #1 by raising his hand and saying, "Excuse me."   When Mack asked why no one had taken his order, Waitress #1 replied, "I'll get a server for you."   Thereafter, Waitress #2 took Mack's order of eggs with grits and toast.

Mack testified that he noticed a later-arriving white couple receive their food after he and Green had been waiting at least an

hour after they had placed their own order. However, Mack testified that the later-arriving white couple was served by Waitress #1, not Waitress #2. When Mack saw the later-arriving white couple receive their food before he did, he stopped Waitress #2 to ask about his order. According to his testimony, Waitress #2 responded that she did not know about his order and walked away. Thereafter, Mack approached Waitress #1 and asked to speak to a manager.

Within 15 minutes, Waitress #1 escorted a manager to Mack's table. Mack admitted that both he and Green tried to talk to the manager at once. Mack testified that he told the manager, "how long it took for [the] waitress to come over," "how [they] were not greeted," "how long it took for [them] to get their order taken," and "how other customers have received their food that came in after [them]." The manager allegedly told Mack that the restaurant was very busy. The manager said they could go to the Waffle House down the street and pick their order up as a to-go order. Mack admitted that he did not ask the manager what had happened to the food he had ordered. Mack testified that the manager "made it sound as if he placed the order down the street for [them] and [they] needed to go pick it up." According to Mack's testimony, nobody at the Piedmont Waffle House referenced Mack's race at any time and no one in the restaurant made any racist statements,

26

slurs, or innuendoes.   Furthermore, Mack did not go to the other Waffle House location to disprove the manager's explanation.

According to Mack's testimony, he did not take any steps to complain about the treatment he allegedly received during 2002. Although it crossed Mack's mind that he should call or write Waffle House and report his alleged mistreatment, he "just didn't follow through with [his] mindset."   Rather, Mack decided to sue Waffle House when he saw a 1-800 telephone number listed in the Atlanta Journal-Constitution newspaper.

### III. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his or her on which he or she bears the ultimate burden of proof. Id. at 322-23.   Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific

27

facts showing that there is a genuine issue for trial.'" <u>Id</u>. at 324.  Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Id</u>. at 322.

### IV. Section 1981 Claims

42 U.S.C. § 1981 provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

To state a claim under § 1981, therefore, a plaintiff must prove a deprivation of one of the enumerated rights which, under similar circumstances, would have been accorded to a person of a different race and also that such deprivation was intentional and motivated by racial prejudice. <u>Solomon v. Waffle House, Inc.</u>, 365 F.Supp.2d 1312, 1321 (N.D. Ga. 2004).  Thus, § 1981 claim requires a showing of (1) failure to perform a contractual obligation which (2) was a result of an intention to discriminate racially. <u>See</u>

General Blg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982).

To prove a *prima facie* case of unlawful race discrimination under 42 U.S.C. § 1981, a plaintiff may attempt to prove his or her case through: (1) direct evidence of discrimination;[19] (2) pattern and practice evidence of discrimination; or (3) circumstantial evidence of discrimination. Afkhami v. Carnival Corp., 305 F.Supp.2d 1308, 1320 (S.D. Fla. 2004). Direct evidence of discrimination is evidence, which if believed, would prove the existence of a fact without inference or presumption. To show a pattern or practice of discrimination, a plaintiff must provide evidence of impermissible discrimination that was the defendant's standard operating procedure through historical, anecdotal, or statistical evidence or a combination thereof. Finally, a plaintiff may prove that she was intentionally discriminated against by presenting circumstantial evidence. Id.

In cases where a plaintiff has no direct evidence of discrimination, courts generally use the burden shifting scheme set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In the context of a § 1981 claim, a plaintiff establishes a *prima facie* case of discrimination by producing sufficient evidence that: (1) the individual is a member of a

---

[19] The plaintiffs have not submitted any direct evidence of discrimination based on race.

protected class; (2) the allegedly discriminatory conduct concerned one or more of the activities enumerated in the statute, i.e., the making performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship; and (3) the defendant treated the plaintiff less favorably with regard to the allegedly discriminatory act than it treated other similarly-situated persons outside of the individual's protected class. Benton v. Cousins Properties, Inc., 230 F.Supp.2d 1351, 1370 (N.D. Ga. 2002).[20] Stated another way, the third prong of a § 1981 claim requires a plaintiff to show an apt comparator of a different race who was not subjected to the same harsh treatment with regard to the enforcement of a contract as was the plaintiff.

Once a plaintiff establishes a *prima facie* case, which thereby permits an inference of discrimination, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse action and must produce some evidence in support of that reason. McDonnell Douglass, 411 U.S. at 802.  If the defendant is able to meet this burden of production, the plaintiff, to survive

---

[20] The same burden-shifting analysis is applied to claims under 42 U.S.C. § 2000a. Solomon, 365 F.Supp.2d at 1331.  Under § 2000a, a plaintiff must show that he (1) is a member of a protected class; (2) attempted to contract for services and afford himself the full benefits and enjoyment of a public accommodation; (3) was denied the full benefit or enjoyment of a public accommodation; and (4) that such services were available to similarly situated persons outside his protected class who received full benefits or who were better treated.

summary judgment, must then present sufficient evidence to demonstrate that the proffered reason is merely a pretext for discrimination. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253-254 (1981).

## A. The Timeliness of the § 1981 Claims of Brenda French and Terrance Taylor

On January 28, 2005, Waffle House filed a motion to dismiss Brenda French on the ground that her claim under 42 U.S.C. § 1981 was untimely filed [Doc. No. 68].  Because Waffle House filed a motion for summary judgment incorporating the arguments made in its motion to dismiss, the court dismissed Waffle House's prior motion to dismiss on mootness grounds [Doc. No. 169].  In its motion for summary judgment, Waffle House has renewed its argument that French's claims are time barred.  Additionally, Waffle House now argues that Taylor's claims are also time barred based on information it obtained during discovery.  Therefore, the court must as a preliminary matter determine whether French and Taylor's § 1981 claims are time barred.

The Original Complaint in this matter was filed on March 17, 2004.  French and Taylor's claims were added to the Amended Complaint on April 27, 2004.  In the Amended Complaint, French's incident was alleged to have transpired on June 24, 2002, while Taylor's was alleged to have occurred "sometime during the summer

of 2002." Discovery revealed that Brenda French's incident occurred on July 8, 2001. However even after discovery, Taylor has been unable to provide an exact date of his incident. Taylor has narrowed the date down to either July 8 or 15, 2000. Considering these facts, Waffle House argues that French and Taylor's § 1981 claims are time barred because they were brought well beyond the applicable two-year statute of limitations to file this claim. Waffle House contends that Georgia's two-year statute of limitations for personal injury actions, O.C.G.A. § 9-3-33, applies to § 1981 causes of action based on conduct occurring in the State of Georgia. Citing to <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369 (2004), French and Taylor, on the other hand, contend that their § 1981 claims are governed by 28 U.S.C. § 1658, a "catch-all" four-year statute of limitations for actions arising under federal statute of limitations for actions arising under federal statutes enacted after December 1, 1990.[21]

On October 4, 2004, Chief Judge Orinda D. Evans reviewed this issue in a similar case. In <u>Dozier v. Waffle House, Inc.</u>, Civil Action No. 1:03-CV-3093-ODE, Judge Evans dismissed the plaintiffs' § 1981 denial of service claims based on the plaintiffs' failure to

---

[21] 28 U.S.C. § 1658 states, in relevant part, "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."

file their claims within Georgia's two-year statute of limitations.

In relevant part, Judge Evans found:

> Plaintiffs do not dispute that the law in this jurisdiction, at least prior to <u>Jones</u>, was to apply Georgia's two-year statute of limitations for personal injury actions to § 1981 claims. Instead, Plaintiffs argue the Supreme Court's decision in <u>Jones</u> "makes it clear that the applicable statute of limitations for Plaintiff's § 1981 claims is the four-year statute of limitations codified at 28 U.S.C. § 1658, and not the two-year statute of limitations for personal injury actions in Georgia." This Court disagrees. <u>Jones</u> did not hold that § 1658 is the applicable statute of limitations for all § 1981 claims. Indeed, the Supreme Court's opinion in <u>Jones</u> only held that the federal "catch-all" four-year statute of limitations applied only when the claim was "made possible" by a post-1990 enactment. Unlike the employment discrimination claims presented in <u>Jones</u> and <u>Patterson</u>, Plaintiffs bring a denial of service claim. It is abundantly clear that such a cause of action was available under § 1981 long before the 1991 amendment adding subsection (b). <u>See, e.g., Black v. Bonds</u>, 308 F.Supp. 774 (S.D. Ala. 1969)(Section 1981 race discrimination claim brought against restaurant alleging waitress's discriminatory conduct towards plaintiffs). Because Plaintiffs cannot show that their denial of service claim was made possible only by the 1991 Act, the federal "catch all" four-year statute of limitations in § 1658 does not apply.

In response, French and Taylor argue that this is not a denial of service case with a two-year statute of limitations, but a case of discriminatory contract terms, conditions, and termination of a contract made possible by the Civil Rights Act amendments of 1991 and subject to the four-year federal catch-all statute of limitations of § 1958. However, neither French nor Taylor has proffered any case or precedent to support the proposition that courts within the Eleventh Circuit have drawn such a distinction

33

between a "denial of service" claim and a "terms and conditions" claim brought under § 1981 in similar factual contexts, i.e., claims originating from customer transactions at public accommodations as opposed to the employment context.[22]   In fact, courts within the Eleventh Circuit have noted that arguments like French and Taylor's would cause results contrary to Congress' intent in enacting § 1658, which was to avoid imposing uncertainty on litigants. Chawla v. Emory University, No. Civ. 1:95-CV-750-JOF, 1997 WL 907570, at *13 (N.D. Ga., Feb. 13, 1997)(quoting House Report No. 101-734).   Like the court in Chawla, this court cannot conclude that Congress intended this sort of confusion over what statute of limitations governs a given claim under § 1981 when it enacted § 1658.   Moreover, the court concludes that an adoption of French and Taylor's arguments would result in claims based on the same statute, i.e., § 1981, potentially having two different statutes of limitations depending merely on how a plaintiff characterizes his claim.   Thus, the court is not willing to adopt the plaintiffs' interpretation of § 1658.

_____

[22] The plaintiffs recently submitted a copy of an order in, Thomas v. Freeway Foods, Inc., 1:04-CV-0525, from the United States District Court from the Middle District of North Carolina for the proposition that certain § 1981 claims have four-year statute of limitations [Doc. No. 225].   However, this court notes that this case is merely persuasive authority from a district court outside of the Eleventh Circuit and this court opts not to adopt the analysis of the Thomas court with regard to the applicable statute of limitations.

Because the court concludes that § 1658 does not apply to either French or Taylor's § 1981 claims, the court must borrow the Georgia statute of limitations for personal injury claims with its two-year statute of limitations. Because their § 1981 claims were brought more than two years after each of the respective incidents, the court concludes that Brenda French and Taylor's § 1981 claims are time barred. Therefore, an examination of the merits of Brenda French and Taylor's § 1981 claims is not necessary.[23]

### B. Eli Jackson

It is undisputed that Jackson, an African-American male, is a member of the class of individuals protected by § 1981. However, Waffle House argues that Jackson has failed to make out a *prima facie* case. Waffle House contends that Jackson cannot establish either the second or third elements of his *prima facie* case under the Benton test. Specifically, Waffle House argues that Jackson was not denied the ability to contract for services and he was not denied the full enjoyment of that contract based on a discriminatory reason since no similarly situated non-African-American patron received more favorable treatment than Jackson.

With regard to the second prong of *prima facie* case of his § 1981 claim under Benton, Jackson alleges that he was intentionally

---

[23] Even if this court had found that French and Taylor's § 1981 claims were not time barred, this court would have still dismissed Brench French and Taylor's § 1981 on the merits pursuant to the reasoning of section V of this order.

discriminated against because he, unlike later-arriving white customers, was asked to prepay for his to-go order. Waffle House argues that to prove the second element of his *prima facie* case under Benton, Jackson must demonstrate that he was actually denied service or the full benefit or enjoyment of a place of public accommodation due to discriminatory conduct, which Waffle House argues that Jackson cannot do. According to Waffle House, "Even Mr. Jackson, however, does not believe the events which transpired during his visit to the Covington Waffle House raises an inference of intentional discrimination based on race. Rather, he believes the alleged mistreatment was more likely based on his attire." However, the court finds Waffle House's arguments unpersuasive because the female server in question asked Jackson, an African-American, to prepay while she did not ask the same of white patrons.

The next question, therefore, is whether Jackson has produced sufficient evidence to satisfy the third prong of his *prima facie* case under Benton, i.e., whether Waffle House treated Jackson less favorably with regard to the allegedly discriminatory act than other similarly situated person outside his protected class. On this point, both parties cite Lizardo v. Denny's Inc., 270 F.3d 94 (2d Cir. 2001), for the applicable standard of similarity required to be proven by the plaintiff in the restaurant context. Under Lizardo, when plaintiffs seek to draw inferences of discrimination

36

by showing that they were similarly situated in all material respects to the individuals to whom they compare themselves, "their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." Id. at 101. "What is key is that they be similar in significant respects." Id.

In the non-employment context, the Northern District of Georgia has interpreted the third prong as requiring § 1981 plaintiffs to produce an "apt comparator." Benton, 230 F.Supp.2d at 1370. Waffle House argues that Jackson cannot establish that a similarly-situated white customer was treated better than Jackson was. Waffle House argues that none of the three allegedly later-arriving white customers who placed to-go orders but were not required to prepay were not similarly situated to Jackson because none of these customers wore the "gangster rap attire." In response, Jackson argues that the comparators do not have to be exact matches of him. The court agrees and finds the significant material facts of Jackson's transaction to be that several white individuals placed to-go orders after Jackson and that they were not asked to prepay, while Jackson, an African-American, was asked

to prepay.[24]   Therefore, the court concludes that Jackson has established a *prima facie* case of his § 1981 claim.

Once a plaintiff establishes a *prima facie* case of race discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. Waffle House's burden to demonstrate a legitimate, nondiscriminatory reason for its actions is "exceedingly light." See Perryman v. Johnson Products Co., 698 F.2d 1138, 1142 (11th Cir. 1983). Waffle House argues, "Mr. Jackson proffered a legitimate, non-discriminatory reason for Ms. Day's alleged mistreatment of him--his attire." However, Waffle House's argument misses the mark. Waffle House's allegedly legitimate, nondiscriminatory reason is merely speculation as to the reason that the female server required Jackson to prepay. During Waffle House's internal investigation of Jackson's complaint, Day did not proffer this reason as her excuse for her request that Jackson prepay; in fact, she stated that she did not remember the incident. Therefore, the court concludes that Waffle House has failed to produce any evidence that would support its speculative reason for requiring Jackson to prepay. Because, Waffle House has not met its burden to put forth a legitimate, nondiscriminatory reason for Day's demand that Jackson prepay,

---

[24] If the court were to adopt Waffle House's argument with regard to the level of comparability necessary, the only proper comparator would be a white person wearing "gangster rap attire." The court declines to require such specificity.

Jackson   has presented a *prima facie* case.   Therefore, summary judgment will not be granted on Jackson's § 1981 claims.[25]

---

[25] Even if the court were to assume that Waffle House's alleged reason was a legitimate, nondiscriminatory reason, the court would have to still conclude that sufficient evidence exists to suggest that Waffle House's proffered reason was pretextual.   To survive summary judgment, Jackson must demonstrate that Waffle House's legitimate, nondiscriminatory reason was merely a pretext for race discrimination.  See Benton, 230 F.Supp.2d at 1369.  Plaintiffs may satisfy this burden by persuading the court that a discriminatory reason more likely motivated the defendant or by showing that the proffered legitimate, nondiscriminatory explanation is unworthy of credence.  Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).  On this point, Jackson argues that "no one at the time or to this day (including Ms. Day) has articulated any such reason, relying instead on conjecture that Waffle House" asked Jackson to prepay because of his attire.  Second, Jackson argues, "even if anyone had ever embraced this reason, Waffle House's argument is akin to saying that Ms. Day didn't discriminate against Mr. Jackson because he was Black, but did discriminate against him because he *dressed* Black."

Considering all of the evidence, including the evidence presented by Jackson in establishing his *prima facie* case, the court concludes that Jackson has submitted evidence that could lead a jury to disbelieve Waffle House's proffered legitimate, nondiscriminatory reason for Day's demand for prepayment. Specifically, Jackson testified and Waffle House has conceded that Jackson was asked to prepay for his food, while three white patrons were not asked to prepay.  However, a review of the record reveals that Day, the female server who served Jackson, could not even recall her transaction with Jackson, so any explanation for Day's actions are merely speculation on Waffle House's part. Furthermore, Jackson has continually maintained that Waffle House discriminated against him because of his "race and attire" and not solely his attire, as Waffle House maintains in its briefs. Therefore, the court concluded that Jackson has met his burden under the McDonnell Douglas framework and has produced sufficient evidence of pretext such that, based on the record as a whole, a trier of fact could find intentional discrimination on the basis of race.

### C. Hakieem Mack

As this court has already explained in a previous order, it is the plaintiffs' responsibility to identify the date of their alleged visits with sufficient specificity "to ensure that their recollections will lead to the discovery of admissible material that, when coupled with their recollections, can prove their claims" [Doc. No. 169].  During the course of discovery, Mack has been unable to provide this court and Waffle House with the exact date of his alleged incident.  In fact, Mack changed the date of the incident numerous times both during and after his deposition. Moreover, Mack's own testimony demonstrates that he cannot provide a specific description of either of the waitresses at the Waffle House he is supposed to have visited, the manager, or the composition of the other customers at the time of the incident. Considering the vagueness of Mack's allegations, the court concludes that Mack is unable to establish a *prima facie* case with regard to his § 1981 claim.

Moreover, Mack has failed to prove a *prima facie* case of intentional discrimination employing circumstantial evidence with regard to any of the above allegations.  Mack has merely juxtaposed the fact of his race with an instance of poor service and a misunderstanding relating to his service.  However, the law requires Mack to set forth specific facts showing that there is a genuine issue for trial on his claim of intentional racial

discrimination. See Federal Rules of Civil Procedure Rule 56(e).
Absent specific facts showing a causal link between the actions of
the employees of the Piedmont Road Waffle House and Mack's race,
his § 1981 claim cannot stand.

Even if the court were to examine the merits of Mack's claims,
the court reaches the same result. Examining the allegations
contained in the Amended Complaint, the court notes that Mack
alleges(1) that he was denied timely service by waiting for over
one hour before having a waitress take his order, (2) that he had
to wait for 45 minutes after he placed his order, and (3) that he
was told that he would have to-go to another Waffle House location
to get his order to-go. Mack argues that he can establish a *prima
facie* case of discrimination under Benton, 230 F.Supp.2d at 1370.

However, in his brief Mack did not even attempt to establish
a *prima facie* case under Benton. Instead he argued that this court
should apply the *prima facie* test set forth in Brooks v. Collis
Foods, Inc., 365 F. Supp.2d 1342, 1357 (N.D. Ga. 2005).[26] In
Brooks, another court within this district adopted a test
enunciated by Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 871
(6th Cir. 2001). Under the Brooks test, a plaintiff establishes a
*prima facie* case of discrimination by demonstrating: (1) he or she
is a member of a protected class; (2) plaintiff made herself

_____

[26] The court in Brooks acknowledged that the Eleventh Circuit
had yet to adopt its formulation of a *prima facie* test. Brooks, 365
F. Supp.2d at 1355.

available to receive and pay for services ordinarily provided by defendant to members of the public; and (3) he or she did not enjoy the privileges and benefits of the contracted for experience under the factual circumstances which rationally support an inference of unlawful discrimination in that: (a) he or she was deprived of services while similarly situated individuals outside her class were not, or (b) he or she received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable. Id. at 1354.

However, the test established in Benton rather than Brooks has been more consistently applied by courts within the Northern District of Georgia. See Slocumb v. Waffle House, Inc., 365 F. Supp. 2d 1332, 1338 (N.D. Ga. 2005). See also Solomon, 365 F. Supp.2d at 1325. Therefore, the court will use the Benton test.[27] Applying the Benton test, the court concludes that Mack failed to present sufficient evidence of a *prima facie* case of intentional

---

[27] Waffle House argues that even if this court were to assume that the Brooks test is applicable, Mack would still be unable to establish that he received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable under such test. The court agrees. Mack's claim is distinguishable from Brooks. In Brooks, the plaintiffs alleged that the workers sang, "When the Saints go Marching In" and "Swing Low Sweet Chariot" after the plaintiffs complained about their poor service and treatment. In this case, there is no evidence in the record that any one in Waffle House used any racial slurs or made other race-related comments towards Mack. Therefore, Mack would be unable to establish a *prima facie* case even under the test articulated in Brooks.

discrimination.[28]   Specifically, the court finds that Mack has failed to put forth any specific evidence other than vague allegations to prove a *prima facie* case under <u>Benton</u> with regard to whether similarly situated white customers were treated better than he was.

### V. Section 2000a Claims

In addition to § 1983 claims, all of the plaintiffs allege racial discrimination in the denial of a public accommodation in violation of 42 U.S.C. § 2000a.   Section 2000a provides:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public

---

[28] Waffle House argues that even if Mack could establish a *prima facie* case under <u>Brooks</u> or <u>Benton</u>, Waffle House has proffered legitimate, nondiscriminatory reasons for his service. With regard to Mack's wait to get a server, Mack testified that he made no attempt to receive service during the first hour of his stay at the Waffle House because he was talking to Green. With regard to the 45-minute wait after he placed his order, there is no dispute that the manager of the Piedmont Road Waffle House told Mack, and Mack admitted, that the Piedmont Road Waffle House location was busy. Moreover, Waffle House states that one of the waitresses provided Mack with an explanation for the delay in service that he encountered.   However, Waffle House admits that it lacks any evidentiary support for its alleged legitimate, nondiscriminatory reasons for Mack's poor service because Mack constantly changed the date of the alleged incident.   Waffle House argues that Mack's constant amendment of the date resulted in Waffle House's inability to obtain discovery on this matter.   In response, Mack argues: "There is no Waffle House anywhere on the planet that couldn't get through a rush and serve someone in 2 hours."   Mack continues, "Waffle House told Mr. Mack and Ms. Green a blatant lie to get them out of the restaurant--their dine-in order would have to be picked up as a to-go order at another restaurant."   However since Mack has failed to make out a *prima facie* case, the court finds it unnecessary to reach the issue of the merits of Waffle House's proffered reasons for Mack's treatment.

accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

To establish a claim under § 2000a, a plaintiff must demonstrate that he (1) is a member of a protected class, (2) attempted to contract for services and afford himself or herself of the full benefits and enjoyment of a public accommodation, (3) was denied the full benefits or enjoyment of a public accommodation, and (4) such services were available to similarly situated persons outside his or her protected class who received full benefits or were treated better. Benton, 230 F.Supp.2d at 1382. The inquiries into whether a plaintiff has established a *prima facie* case of a § 2000a claim and a § 1981 claim are substantially the same and all of the parties have briefed them as such.

### A. Brenda French
### 1. Laches

As a preliminary matter, the court must determine whether Brenda French's § 2000a claim is barred by the equitable defense of laches. Because only equitable relief is available under § 2000a, courts have found that no statute of limitations applies to § 2000a claims. See Mussington v. St. Luke's Roosevelt Hosp. Ctr., 824 F.Supp. 427, 433 n.4 (S.D.N.Y. 1993). Waffle House argues that "the doctrine of laches serves as a limitation to prevent a plaintiff from sleeping on her right to sue." Specifically, Waffle House argues that Brenda French's claims are barred by laches because (1) she inexcusably delayed in bringing this action and (2)

44

Waffle House has been prejudiced by Brenda French's almost three-year delay.   According to Waffle House, "None of the three employees scheduled to work during French's alleged incident remain employed by Waffle House, and the restaurant, Unit #32, has since closed;" Waffle House argues that under these circumstances, it would suffer excessive and unjustified prejudice.   In response, Brenda French argues that the burden of showing prejudice is on Waffle House.   Furthermore, Brenda French argues, "Thanks to the available police records (including a video tape) and the Frenches' detailed recollection of what occurred, we know when this happened, who the accused is, and a great deal about what he said and did."

Additionally, Brenda French argues, "Waffle House would have had contemporaneous access to whatever evidence it wanted had it paid attention to this situation when it happened."   Brenda French contends that Nicole French's verbal and heated argument which resulted in the police being called and the issuance of a police report as well as her verbal complaint to a manager at another Waffle House on the same night of the incident should have alerted Waffle House of the incident.   Lastly, French argues that she personally reported the incident to Waffle House's hotline.

The court concludes that the evidence in the record and cited by Brenda French should have provided Waffle House with sufficient notice of Brenda French's potential claim against it.   Therefore, the court concludes that Waffle House has suffered no prejudice and

that the defense of laches is inapplicable to Brenda French's §
2000a claim.[29]

## 2. Brenda French's Injunctive Relief

Next, the court must address whether Brenda French may seek
injunctive relief under § 2000a.  Waffle House argues because she
cannot show a "real or immediate threat that [she] will be wronged
again," Laroche v. Denny's Inc., 62 F. Supp.2d 1366, 1374 (S.D.
Fla. 1999), that Brenda French is not entitled to injunctive
relief.  However, Brenda French has testified that she has dined in
a Waffle House after the alleged incident.  In fact, Brenda French
visited a Waffle House on the same night of the incident in
question.  Because the possibility exists that she will be wronged
again, the court concludes that Brenda French may seek injunctive
relief under § 2000a.

## 3. The Merits of French's § 2000a Claim

Having found that Brenda French's claim is not barred by
laches and that she could seek an injunction, the court turns to

---

[29] Alternatively, Waffle House argues that the theory of
"unclean hands" bars Brenda French's § 2000a claim.  According to
Waffle House, "[i]t is undisputed that French allowed her daughter
Nicole to threaten the Waffle House cook with physical violence by
saying, 'I would come across the counter and grab you.  You don't
know me very well.'"  Waffle House continues, "Where, as here, a
party 'has so conducted [her]self as to shock the moral
sensibilities of the judge,' the unclean hands maxim does not
permit recovery."  In response, Brenda French argues that Nicole's
actions did not rise to the level of "shock[ing] the moral
sensibilities so as to support an unclean hands defense."  This
court agrees and finds that the unclean hands defense is
inapplicable to this situation.

the merits of her § 2000a claim.  Waffle House argues that Brenda French cannot establish a *prima facie* case of intentional discrimination.  Specifically, Waffle House argues that Brenda French cannot establish she was denied service and that she cannot establish that similarly-situated white patrons were treated more favorably she was.

Waffle House argues that a 30 or 45-minute wait for her order standing alone for food is not actionable under § 1981.  The court agrees.  See, e.g., Robertson v. Burger King, Inc., 848 F.Supp. 78, 81 (E.D. La. 1994)("While inconvenient, frustrating, and all too common, the mere fact of slow service. . . does not rise to the level of violating one's civil rights.")  Therefore, Brenda French's 30 or 45-minute wait for her order standing alone is insufficient to be actionable under § 2000a.

Next, the court turns to the cook's request that Brenda French leave the restaurant.  Waffle House argues that Brenda French was being served until Nicole French's unruly behavior caused her party to be ejected.  On this point, there is a factual dispute in the record.  Brenda French argues that the cook never began her order, while Waffle House states that the cook was prioritizing the orders focusing on the dine-in and smaller orders first and working his way to the Frenches' order.

Nicole French testified that after the cook overhead her conversation with Brenda French regarding why the food was taking

so long, the cook said he was doing the best he could.   Then, Nicole French retorted that couldn't be true.   The cook then said that he didn't have to serve them.   Nicole then replied, "I hope it's not because she is black."   After being accused of racial discrimination, the cook stated that he didn't have to serve them and they could get out.   For purposes of determining whether a *prima facia* case has been made, the court finds that by ordering Brenda French to leave the restaurant, Waffle House denied Brenda French the full benefits and enjoyment of a place of public accommodation.

In order to satisfy the fourth prong of the *prima facie* case of a § 2000a claim under <u>Benton</u>, Brenda French must prove that Waffle House treated her less favorably with regard to the allegedly discriminatory act than it treated other similarly situated persons who were outside her protected class.   Waffle House argues that the white customers who entered the establishment after Brenda French were not similarly situated to Brenda French because (1) their food orders are unknown, (2) the white customers did not did not place to-go orders, and (3) no else displayed disruptive or unruly behavior.   In response, Brenda French argues that the white customers who entered the Waffle House after Brenda and placed to-go orders were proper comparators.   However, the record reveals that at least one of the white customers, i.e., the

48

white customer who was handed three takeout containers, appears to have placed a to-go order.

Therefore, the court's inquiry into whether a similarly-situated white customers was treated better than Brenda French turns on whether Waffle House's argument that no white person was similarly situated because no white person displayed disruptive or unruly behavior has merit.   It is undisputed that Nicole French said, "I would come across the counter and grab you.   You don't know me very well."   Moreover, Nicole stated that she hoped that her mother's wait was not the result of her mother's race.   The verbal exchange between Nicole French and the cook is a highly relevant point of comparison in determining whether any of the white persons who entered the Waffle House after Brenda French are "similarly situated" to Brenda French.   On this point, Brenda French argues, "It is ridiculous and circular to suggest, as Waffle House does, that a person angered by discriminatory treatment is not similarly situated to others just because those others, having suffered *no* discrimination, were not angry."(italics in original). However, the court disagrees.

The court finds it relevant whether the employees of the Waffle House asked persons outside Brenda French's protected class to leave under similar circumstances of the night in question, i.e., for displaying unruly behavior. On this point, Brenda French has offered no evidence that Waffle House did not ask patrons

outside of Brenda French's class to leave under similar or more egregious circumstances.  Morever, far from leading to an inference that the cook asked the Frenches to leave the premises as the result of alleged racial discrimination, the shouting incident between Nicole French and the cook and Nicole French's threat to assault the cook is evidence that the cook asked the Frenches to leave as the result of the heated verbal argument and Nicole French's words and actions.[30]

As one court has written, "[d]isputes generally arise out of mutual misunderstanding, misinterpretation, and overreaction, and without more, such disputes do not give rise to an inference of discrimination." Johnson v. Legal Servs. of Ark., Inc., 813 F.2d 893, 896 (8th Cir. 1987).  Moreover, there is no evidence that the cook used a racial slur during this incident.  Because Brenda French has failed to produce evidence that a similarly situated white individual was treated more favorably than she, her § 2000a claim fails as a matter of law.[31]

---

[30] The court also notes that an African-American male placed a to-go order after Brenda French and received it in a relatively speedy manner.  This fact gives further support to the proposition that the cook's request for Brenda French to leave the Waffle House was related to her daughter's disruptive behavior rather than the Frenches' race.

[31] Waffle House argues, "The affirmative defense recognized by the Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998)("Faragher/Ellerth"), which is typically applied to Title VII employment discrimination claims should also serve as a complete defense to Plaintiff's claims here."  Waffle House argues that it

Even assuming Brenda French could make out a *prima facie* case of intentional race discrimination with respect to her ejection from the restaurant, the court finds that Waffle House has proffered a legitimate, nondiscriminatory reason for her ejection. Waffle House argues that the cook asked Brenda French to leave only after her daughter threatened the cook, and this court agrees that Nicole French's statement was a display of unruly behavior, giving the cook a legitimate, nondiscriminatory reason for asking the Frenches to leave the premises.

Lastly, Brenda French has not demonstrated that Waffle House's proffered legitimate, nondiscriminatory reason was pretextual. The United State Supreme Court in <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 515 (1993) noted, "[A] reason cannot be proved to be a 'pretext *for* discrimination' unless it is shown *both* that the reason was false *and* that discrimination was the real reason." (emphasis in the original). Brenda French has not produced any evidence that the legitimate, nondiscriminatory reason proffered for her ejection from the restaurant were false or unworthy of belief or that the real reason for her ejection from the Waffle

---

exercised reasonable care to prevent customer discrimination and Brenda French unreasonably failed to complain about her experience for almost three years. However, the court concludes that <u>Faragher/Ellerth</u> doctrine does not apply to the facts of this case. While some courts have allowed the <u>Faragher/Ellerth</u> defense in cases involving § 1981, such courts have generally allowed such a defense only when a § 1981 claim was coupled with a Title VII claim in the employment context which is not the case here. <u>See, e.g., Morgan v. Fellini's Pizza, Inc.</u>, 76 F.Supp.2d 1368 (N.D. Ga. 1999).

House was her race, rather than Nicole French's disruptive behavior.  Therefore, Waffle House is entitled to summary judgment in its favor with regard to Brenda French's § 2000a claims.

## B. Eli Jackson
## 1. Merits of Jackson's § 2000a Claim

For the reasons set forth in Section III, part B of this order, the court also denies Waffle House's motion for summary judgment on Jackson's § 2000a claim.


## 2. Injunctive Relief

Next, this court must determine whether Jackson has standing to obtain injunctive relief under § 2000a.  In order for an injunction to issue, Jackson must show a "real immediate threat that [he] will be wronged again." Solomon, 365 F. Supp.2d at 1330.  In his deposition, Jackson testified, "I concluded that I didn't want to go back to Waffle House the way they handled the investigation."  Jackson also testified that it's "hard to say" whether he'll go back to Waffle House and that he had no plans to return as of the day of the deposition.  However, Jackson has submitted a declaration stating that he would return to Waffle House if Waffle House amended its polices.  As such, Jackson has demonstrated that he is "able and ready" to dine at a Waffle House

should the restaurant take significant steps to prevent discriminatory practices by its employees.[32]

Additionally, Waffle House argues that Jackson has failed to identify any specific injunctive relief he seeks from the court. However, Jackson did offer a solution during his deposition: "They need to correct the policies or enforce their policies or have someone monitor their policies, to see if they've been--being enforced." Additionally, Jackson suggests that this could be accomplished by having "Waffle House put under a federal monitor. To monitor the policies of Waffle House, to make sure that-that the main thing throughout-that discrimination is-eliminated throughout the Waffle Houses." Moreover, Jackson suggested that Day should be fired for her request that he prepay. Considering Jackson's own testimony, the court finds Waffle House's argument that Jackson did not identify any specific injunctive relief to be without merit. Thus, the court concludes that Jackson has standing to obtain injunctive relief.

---

[32] Citing to <u>Harrison v. Denny's Rest., Inc.</u>, No. 96-0343, 1997 WL 227963, *4 n.7 (N.D. Cal., Apr. 24, 1997), Waffle House argues that since Jackson admits that he has never seen any other African-American patrons receive any discriminatory treatment during any of his 700 Waffle House visits, his § 2000a claim should be dismissed. However, Waffle House's reliance on <u>Harrison</u> is misplaced. The footnote cited and relied upon by Waffle House is merely dicta. The court in <u>Harrison</u> disposed of that case on the merits.

### C. Terrance Taylor

Citing to <u>Blowe v. Northlake Foods, Inc. & Waffle House, Inc.</u>, No. 3:04-CV-00717(E.D. Va.), Waffle House argues that Taylor's claims are barred by the doctrine of laches because (1) he inexcusably delayed in bringing this action and (2) Waffle House has been prejudiced by his almost four-year delay. The court agrees. In arriving at this conclusion, the court notes that (1) Taylor delayed for almost 4 years in bringing his claim; (2) Taylor has not proffered a sufficient reason for the delay; and (3) Waffle House has suffered prejudice from Taylor's actions. The court finds the only reason proffered by Taylor for delaying bringing, i.e., that he was "not sure what avenue to take," to be without merit. With regard to the prejudice suffered by Waffle House, Waffle House stated:

> Mr. Taylor has led Waffle House on several wild goose chases by providing, under oath, various date ranges for his alleged visit to the Stockbridge Waffle House. Indeed, seventeen months after he filed this lawsuit, Mr. Taylor still cannot identify the specific date of his alleged visit to the Stockbridge Waffle House. While he currently asserts that the alleged visit occurred on either July 8 <u>or</u> July 15, 2000, he did not provide these dates until <u>after</u> discovery concluded.

In its order dated November 8, 2004, the court noted that Taylor was required to provide the court and Waffle House with a more specific date and time of his alleged incident in order to provide for meaningful discovery. The evidence in the record demonstrates that Taylor has provided Waffle House with differing

dates over the course of discovery and has failed to comply with this court's prior order. Moreover in determining that Waffle House was prejudiced by Taylor's action, the court places great significance on the fact that Taylor's most recent amendment of the date of the alleged incident occurred either near the end of or after discovery. Taylor's amendment of the date of the incident via his declaration left Waffle House without time to properly reinvestigate his claims and re-depose Taylor. Taylor's constant amendment of the date of the alleged incident prejudiced Waffle House. Therefore, the court concludes that the equitable defense of laches bars Taylor's § 2000a claim.[33]

---

[33] Even if this court had reached the merits of Taylor's § 1981 and § 2000a claims, the court would still have dismissed both of Taylor's claims under both the Benton and Brooks tests. Taylor cannot satisfy the third element of a *prima facie* case under Benton because he cannot demonstrate that Waffle House treated him less favorably than similarly situated white customers. It was Taylor's testimony that the white couple which sat by him on the counter were dine-in customers and did not place to-go orders. With regard to the waitress's request that he prepay for his order, the court finds that Taylor has not submitted any evidence that a similarly situated white customer, i.e., one who had a to-go order, was not asked to prepay as well.

Moreover even if Brooks applied, Taylor cannot establish a *prima facie* because he cannot demonstrate that he received services in a "markedly hostile" manner which a reasonable person would find objectionable. The fact that the grill cook ignored Taylor, who yelled at him from less than five feet away, was not unreasonably hostile, and Taylor has not submitted any evidence that the cook's actions were related to his race.

### D. Hakieem Mack

As noted earlier, the court's inquiry into § 2000a claims and § 1981 claims is substantially the same.  As the court concluded in Section III, part c in this order, Mack has failed to produce sufficient specific evidence to establish a *prima facie* case of intentional race discrimination under § 1981 as well as § 2000a.[34]

### VI. Punitive Damages

An employer may not be held liable for punitive damages for a server's misconduct unless the plaintiff produces evidence that management ratified or approved the discriminatory acts.  See Slocumb, 365 F. Supp.2d at 1341-42.  The only remaining plaintiff in this suit is Jackson.  With regard to punitive damages, Waffle House argues that Jackson is not entitled to punitive damages because (1) he never raised his concerns regarding his perceived discrimination to the manager on duty and (2) he cannot show that Waffle House acted with reckless disregard to his federally protected rights.

_____

[34] Additionally Waffle House argues, that "Because Mr. Mack cannot choose any of thirty-three dates he has reserved for himself or specifically identify even one employee who worked on the date of his alleged visit, Waffle House has been and continues to be deprived of its right to refute Mr. Mack's claims with specific eyewitness testimony."  Consequently, Waffle House argues that the laches doctrine bars Mack's § 2000a claim.  The court agrees. Therefore, the court would have alternatively dismissed Mack's § 2000a claim on laches, if it had not already dismissed that claim on the merits.

Waffle House's first argument is without merit because the evidence in the record demonstrates that Jackson called Waffle House's customer hot-line within a relatively short time of his experience at the Waffle House.   In response to Waffle House's second argument, Jackson argues that he "informed Waffle House through the customer service number and Waffle House followed up by sitting on the investigation for *three* months, conducting a sham investigation, coercing employees to lie, dismissing Mr. Jackson's complaint with a form letter and letting Deborah Day continue her job interrupted."  Waffle House contends that Jackson's allegations alone are insufficient to raise a credible issue that it acted with reckless disregard of Jackson's rights.   While the evidence proffered in support of his claim for punitive damages is thin, the court concludes that Jackson's allegations are sufficient to avoid summary judgment.

## VII.  Conclusion

For reasons stated above, Waffle House's motions for summary judgment with regard to plaintiffs Taylor [Doc. No. 138], Brenda French [Doc. No. 139], and Mack [Doc. No. 205] are GRANTED in their entirety; Waffle House's motion for summary judgment with respect to Jackson [Doc. No. 136] is DENIED in its entirety; Waffle House's motion to strike is GRANTED as that motion refers to the affidavits of Kasinger, Dale, Gainey, Bonner, Taylor, Fox, Gantt, and the deposition of Gantt [Doc. No. 170]; and the plaintiffs' motion to

file certain documents under seal [Doc. No. 219] is GRANTED.  The

parties are directed to submit a proposed consolidated pretrial

order within 45 days of the docketing of this order.


SO ORDERED, this **30**$^{TH}$ day of January, 2006.


_Robert L. Vining, Jr._
ROBERT L. VINING, JR.
Senior United States District Judge